## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

DEWEY GRINER,

      Petitioner,

 v.                                                                CASE NO. 8:05-CV-1568-T-27MSS

JAMES V. McDONOUGH, et al.,

      Respondents.

_____/

### ORDER

Before the Court is a petition for writ of habeas corpus (hereinafter "petition") filed by an inmate, Dewey Griner (hereinafter "Griner" or "Petitioner"), in a Florida penal institution *pro se* pursuant to 28 U.S.C. § 2254 challenging a sentence entered by the Twelfth Judicial Circuit Court, Manatee County, Florida (Dkt. 1). Petitioner's challenge relates to his 2002 conviction for second degree murder. Respondents filed a response to the Petition (Dkt. 9). Although granted the opportunity to do so, Petitioner has not filed a reply to the response ( *See* Dkts. 3, 10, 13). The matter is now before the Court for consideration on the merits of the petition.

### Background

Petitioner was charged by Amended Information with second degree murder[1] (Resp., Ex. 1, Vol. I at pp. 63-64). Following a jury trial, Griner was found guilty as charged (Id. at pp. 148-149). Petitioner was sentenced to life in prison (Resp., Ex. 3 at p. 3).

---

[1]Petitioner was also charged with possession of a firearm by a convicted felon (Resp., Ex. 1, Vol. I at pp. 63-64). However, according to Respondent the state nolle prossed the possession of a firearm charge on December 9, 2002.

**Facts Adduced at Trial**

The following is taken from Griner's statement of facts provided in his Amended Initial

Brief on direct appeal:

Prior to the trial of this case, the trial court conducted a hearing on the issue of a hearsay statement - a dying declaration. (R.II. 210) Deputy Kevin Vreeland, with the Manatee County Sheriff's Office (MCSO) testified. On June 16, 2001, He [sic] responded to a scene of a shooting. (R.II. 212) He met the victim in this case, Vernon Dixon. (R.II. 213) Dixon was lying on the ground in front of a doorway - Dixon was gasping for breath; complaining of severe pain and he was bleeding. (R.II. 213) Dixon told Vreeland he had been shot. (R.II. 215) Vreeland saw several apparent gunshot wounds to Dixon. (R.II. 215)

Vreeland was with Dixon from about two (2) minutes to ten (10) minutes until emergency medical technicians arrived. (R.II. 217) Vreeland was unsure of the time. (R.II. 217) Dixon said that the person who shot him was Dewey. (R.II. 219) There was little evidence of external bleeding. (R.II. 221)

Deputy George McCorkle of the MCSO also went to the scene of the shooting. (R.II. 222-223) He arrived at about the same time as Vreeland. (R.II. 223) According to McCorkle, Dixon appeared to be in pain and kept screaming, I need air. (R.II. 223-224)

Lieutenant William Evers of the MCSO went to the scene.(R.II. 226) When he got to the scene, Vreeland was attending to Dixon. (R. II . 227) According to Evers, Dixon said he wasn't going to make it and that he needed air. (R. II . 228) Evers asked Dixon who shot him - Dixon said Dewey.(R. II . 229) Evers asked Dixon if Dewey was white or black - Dixon said Dewey had " bright skin. " (R. II . 229) Evers testified he said "so he' s black " and Dixon said "yes." (R. . II. 229)

Evers testified that Dixon had a grimace on his face and he was spitting blood. (R. . II . 230) Evers never got a reply to his question about the last name of Dewey. (R. II. 230) Evers asked about the "street" name of the shooter - Dixon again said Dewey. (R.II . 230)

The first thing Dixon said was in response to the question about who shot him. (R. II . 232) According to Evers, Dixon said he was not going to make it after he had already said Dewey was the person who shot him. (R. II . 233-234)

After hearsay arguments from the parties, the trial court ruled that the

2

hearsay statements would be admissible as statements made under the belief of impending death. (R. II . 240-241) The trial then began. After jury selection, there was discussion about the deposition of a state witness, Mr . Mayes. (R. III . 112) He has been missing up until the trial. (R. III . 112) The trial court then gave defense counsel the opportunity to depose Mayes. (R. III. 114 ) The Court advised counsel to depose Mayes and if there were surprises then the Court would discuss them. (R.III. 115) The Court eventually recessed until the next morning. (R.III. 131-132)

The trial testimony then began. Marilyn Heiler lives in Bradenton. (R.IV. 158) On the night in question, she was sleeping (around 1:20 a.m.) (R.IV. 161) Heiler's husband woke her up and asked if she heard the gunshots. (R. IV. 162) Her husband said there were was gunshots and someone was pounding on the door. (R.IV. 162) Heiler got up and went to the door - someone was pounding on the door and saying, "please call the police, I've been shot, call 911." (R. IV. 162) Heiler did not open the door; she looked out the window and saw a black man on the doorstop. (R.IV. 163-164)

After the police arrived, Heiler went outside; she did not know the man. (R.IV. 165) The police and rescue were talking with the man - the man was coherent and he was speaking. (R-IV. 165) Heiler did not know Appellant. (R.IV. 166)

Arthur Heiler testified he heard four (4) shots. (R. IV. 1670- 171) He did not open the door. (R. IV. 172) He did not know Appellant. (R.IV. 174) Prior to the shots, Heiler did not hear an argument. (R.IV. 174)

Deputy Kevin Vreeland of the MCSO testified that he went to the scene of the shooting. (R. IV. 176-177) He found a man, who had been shot, laying at the doorstep to a duplex. (R.IV. 178) He saw several apparent gunshot wounds. (R. IV. 179) The man was having difficulty breathing and he was complaining of back pain. (R.IV.181) He said he was shot by Dewey, after the victim was asked who shot him. (R.IV. 182) He said Dewey once or twice. (R-IV. 185) There was no description in terms of race, size or build. (R.IV.185-186)

Deputy George McCorkle of the MCSO went to the scene on June 16, 2001 at about 1:25 a.m. (R.IV. 192) He saw the man laying on the doorstep - the man was screaming, gasping for air - the man kept saying I can't breathe, I can't breathe. (R.IV. 194) He was unable to hear any other statements made by the victim. (R. IV.196)

Lieutenant William Evers of the MCSO also went to the scene. (R.IV. 198) When he arrived, Vreeland was attending to Vernon Dixon. (R. IV. 199-200)

3

Dixon was saying "I need air." (R. IV. 201) Evers asked Dixon, who shot you? Appellant objected and the trial court overruled on the basis of excited utterance. (R. IV. 202) According to Evers, Dixon said Dewey. (R.IV. 202) Evers asked if the Dewey was black or white; Appellant objected, hearsay. (R.IV. 263) The trial court stated overruled. (R. IV. 203) Evers testified Dixon said the man had bright skin. (R.IV. 203) Evers then said, "he's black"; Appellant objected (stated as same objection). (R.IV. 204) The trial court stated overruled. (R.IV. 204)

Evers testified that Dixon was spitting blood; he was starting to grimace; he was saying I need air, I can't breathe . ( R . IV . 204) Over objection, Evers testified that Dixon said " I ' m not going to make it." ( R . IV . 205) Evers asked Dixon the street name of Dewey; Dixon said Dewey. ( R . IV . 205)

Carla Jones lived at the scene - four (4) or five (5) duplexes down from where Dixon got shot. ( R . IV . 208) She is afraid of Tabatha Walker; she knew Vernon Dixon. ( R . IV . 209) On the date in question at about 3:00 p.m., she saw Appellant and Dixon - they were in Walker's duplex. ( R . IV . 209) Jones identified Appellant. ( R . IV . 210)

On the night in question, she heard gun shots coming from outside Walker's duplex. (R. IV . 211) She was awakened by two (2) or three (3) shots. (R. . IV . 211) She eventually went outside and saw somebody running - she could not describe who it was - it was too dark. (R. IV . 212) The person was black. (R. IV . 212)

During a recess, defense counsel asked for permission to talk with Stacy Walker (before she testified) based on the Mayes deposition. (R . IV . 216-217) The Court advised counsel to talk to her during lunch. (R.IV. 217) Tabatha Walker lived at the scene. (R. IV . 227) She knew Vernon Dixon. (R. IV . 227) Dixon was the cousin of Walker's boyfriend. (R. IV . 228) Walker also knows Appellant. (R. IV . 229) She testified that Appellant's mother and grandmother are white - he is biracial and bright skinned. (R.IV. 230)

On the night in question, Walker expected Dixon to come over to her house. (R.IV. 231) About 1:20 a.m., she heard what she thought was six (6) firecrackers going off at her back door. (R.IV. 232) She did not witness the shooting. (R.IV. 232) Walker went outside (with a flashlight); she saw Dixon's car. (R.IV. 234) She then called Dixon's cell phone - no answer. (R.IV. 235) She then found Dixon's phone and his car keys by a ditch. (R.IV. 236) She called 911 and then saw the paramedic truck down the road. (R.IV. 237) She walked over there and saw Dixon laying on the doorstep. (R. IV. 237)

Walker had seen Appellant earlier that afternoon with William

4

Mayes at her house. (R.IV. 239) Christine Judd was also there. (R.IV. 239)
Appellant told Judd he needed money for a bill; he needed someone to help pay
the bill. (R.IV. 240) Judd did not give Appellant any money. (R. IV. 243) Prior to
the firecracker sounds, Walker did not hear any angry words or arguments. (R.IV.
245) Stacy Walker lived at the scene of the shooting. (R. IV. 253) She knows
Appellant. (R.IV. 253) She knows William Mayes - he is black, medium skin
color. (R. IV. 254) Mayes is known as "Heavy." (R.IV. 253-255) On the day in
question, she saw Appellant in the afternoon. (R.IV. 256) Heavy was with
Appellant. (R-IV. 256) She also saw Heavy and Appellant in the evening in June
16, 2001. (R.IV. 256)

Around 1:20 a.m., on June 16, 2001, Walker was at home with her
children. (R.IV. 257) She was awakened by someone banging on the door - she
went to the door but no one was there. (R.IV. 258) There was a second knocking
on the door. (R.IV. 259) Walker again opens the door and sees Appellant. (R.IV.
259) Appellant asked Walker to take Heavy to a hospital. (R.IV. 260) She asked
Appellant what happened to him - he said he had been shot. (R.IV. 260)

Walker and her boyfriend get in a car and drive around the block -
Appellant flagged them down. (R.IV. 262) She saw Appellant's car (a blue
Toyota). Heavy was sitting inside of it. (R.IV. 262) Walker got into the Toyota
and drove Heavy to a fire station. (R.IV. 264-265) Appellant stayed at the scene.
(R.IV.264) Mayes (Heavy) kept saying to get some help and don't let him die.
(R.IV. 265) Walker did not later tell the police that Appellant knocked on her
door. (R.IV. 268-269) She told the police Heavy knocked on her door. (R-IV. 280-
281) The police confiscated the car. (R. IV. 269) When she returned home,
Appellant was not there. (R.IV. 270)

The next morning Appellant came to Walker's house; she told him the
police were looking for him. (R.IV. 271) The police told Walker that she could be
charged unless her story came out different. (R.IV. 282) Appellant never told
Walker he shot Vernon Dixon. (R.IV. 287) She didn't see who shot Dixon. (R.IV.
290) She didn't hear the shots. (R.IV. 290)

Defense counsel later renewed his request for a continuance. (R.IV. 309)
Counsel stated he needed a little more time to get the deposition transcript
organized. (R.IV. 309)

Allen Moss was in the Sarasota County Jail with Appellant. (R.V. 356)
According to Moss, Appellant talked about the charges against him. (R.V. 362)
Appellant said he was worried about what Heavy would say. (R.V. 362)
According to Moss, Appellant said Heavy wasn't going to come forward. (R.V.
362) Appellant said he fired the gun that killed Dixon. (R.V. 363) Appellant said

he and Heavy were there to rob Dixon. (R.V. 363)

Over objection, (evidence more prejudicial than probative under Section 90.403, Florida Statutes), Moss testified that the reason he came forward is that Appellant had no remorse, he didn't care and he was laughing about the murder. (R.V. 388)

Prior to William Mayes's testimony, defense counsel stated he was not ready to go forward because he did not have the access (the state had on the issue of Mayes's prior felony convictions for impeachment purposes. (R.V. 392-393) The Court denied the request. (R.V. 393-394)

William Mayes then testified. He is 19. (R.V. 394) He testified he had known Appellant for almost all of his life. (R.V.395) Around June 16, 2001, Mayes would see Appellant often. ( R.V.396) On the night in question, Appellant and Mayes (Heavy) went to the area where marijuana and crack were sold. ( R.V . 397) Appellant and Mays went there to buy some weed or sell some crack. ( R . V. 397) Appellant objected on the grounds that he was there to sell crack or buy weed; the state had not filed a notice of its intent to introduce this evidence. ( R. V. 398) Appellant also raised a Section 90.403 objection. ( R. V. 398) Appellant moved for a mistrial - the trial court overruled the objection. ( R. V. 398) Mayes testified he and Appellant had used cocaine and marijuana. ( R. V. 399) Mayes explained how he and Appellant put cocaine on top of marijuana inside of a cigar - rolled up and smoked. ( R. V. 399)

Appellant and Mayes drive to Duplex City - they get out of the car and walk towards the apartments. ( R. V. 400) Mayes saw and [sic] old man in his 30's, 40's sitting in a chair. ( R. V. 401) Mayes sold the man some crack. ( R . V . 402) Appellant was standing behind Mayes. ( R. V. 402, 205) Mayes did not know the man's name. (R.V. 402) A car then pulled up and a man walks up. ( R. V. 405) Mayes then hears Appellant and the man cussing at each other. ( R. V. 406) Gunshots are then fired - the shots came from behind Mayes. ( R. V.407) The other person (from the car) is running in front of Mayes. ( R. V. 407) The last things Mayes saw was the man's back as he ran. ( R. V. 409) Mayes fell down because he was shot. ( R. V. 409) He got up and crawled back to the car. ( R. V. 410)

Appellant was in the car; he drove to his sister's house. (R.V. 413) Appellant goes to the house and a black female comes out. (R.V. 414) She drives him to a fire station. (R.V. 415) No one is there and she takes him to a McDonald's. (R.V. 416)

Mayes was high on drugs on the night in question. (R.V. 417) There was

6

no plan for Appellant and Mayes to rob the person who got shot. (R.V. 423) They didn't know if the guy had drugs or money on him. (R.V. 423) Mayes did not try to take money from the victim. (R.V. 420) Mayes was not shot as he bent down and went through the victim's pockets. (R.V. 424) Mayes did not see Appellant with a gun that night. (R.V. 428) He did not see Appellant shoot anybody that night. (R.V. 428)

Dr. Wilson Broussard did the autopsy in this case. (R.VI.453-454) The cause of death of Vernon Dixon was a gunshot wound to the chest. (R.VI. 454) Two (2) bullets struck Dixon. (R.VI. 457-458) Dixon was not facing the shooter when he was shot. (R.VI.465-466)

The parties stipulated that fingerprints lifted from the blue Toyota belonged to Appellant. (R.VI. 474-475) The state then rested its case. (R.VI. 475) Appellant moved for a judgment of acquittal; the court denied it. (R.VI. 475-476)

The defense then presented its case. LaSasha Green knows Appellant; he is a friend of Green's boyfriend. (R.VI. 483) Appellant lived with Green and her boyfriend. (R.VI. 484) She did not know if Appellant was at her apartment on the night of the shooting. (R.VI. 486)

Tiffany Howard was Williams Mayes's girlfriend before he was shot. (R.VI. 488) Appellant would not hang out with Mayes. (R.VI.489) She did not know Appellant. (R.VI. 489)

Dalisha Abney was a past girlfriend of Appellant. (R.VI. 492) On the night of the murder, Appellant was with Abney. (R.VI. 492) The next morning, a friend told Abney the police were looking for Appellant for murder. (R.VI. 494) Abney said that couldn't be, he was with me. He is in my bed right now. (R.VI. 494) Around 1:20 a.m., Abney was having sex with Appellant. (R.VI. 497) After Abney's testimony, the defense rested. (R.VI. 500)

After closing statement, jury instructions and deliberation, the jury found Appellant guilty of second degree murder with a firearm. (R. I. 148-149)

(Resp., Ex. 3 - Amended Initial Brief of Appellant at pp. 3-13).

Griner pursued a direct appeal, and the appellate court per curiam affirmed his conviction

and sentence on January 9, 2004 (Resp.,  Ex. 7);  *see Griner v. State*, 869 So. 2d 552 (Fla. 2d

DCA 2004)[table].

On September 17, 2004, Petitioner filed a motion for post-conviction relief pursuant to Fla. R. Crim. P. 3.850 (Resp., Ex. 9). The state court denied Petitioner's 3.850 motion on December 6, 2004 (Resp., Ex. 10). Petitioner appealed, and on May 13, 2005, the appellate court per curiam affirmed the denial of Petitioner's 3.850 post-conviction motion (Resp., Ex. 15); *see Griner v. State*, 907 So. 2d 526 (Fla. 2d DCA 2005)[table].

### Petitioner's Federal Habeas Petition

Petitioner filed a timely petition for federal habeas relief on August 18, 2005,[2] raising fifteen claims for relief.

### Evidentiary Hearing

The Court has carefully reviewed the record and concludes Petitioner is not entitled to an evidentiary hearing. *See Smith v. Singletary*, 170 F.3d 1051, 1053-54 (11th Cir. 1999). The pertinent facts of the case are fully developed in the record before the Court. *See Cave v. Singletary*, 971 F.2d 1513, 1516 (11th Cir. 1992). Thus, no additional evidentiary proceedings are required. *See High v. Head*, 209 F.3d 1257, 1263 (11th Cir. 2000), *cert. denied*, 532 U.S. 909 (2001) (citing *McCleskey v. Zant*, 499 U.S. 467, 494 (1991)).

### Standards of Review

Under 28 U.S.C. § 2254(d)[3] and (e) as amended by the Antiterrorism and Effective Death

---

[2] Although the Court received Petitioner's petition on August 24, 2005, a pro se inmate's petition is deemed filed the date it is delivered to prison officials for mailing. *Houston v. Lack,* 487 U.S. 266, 271-272 (1988); *Adams v. United States,* 173 F.3d 1339, 1340-41 (11th Cir. 1999); *Garvey v. Vaughn,* 993 F.2d 776, 780 (11th Cir. 1993). Petitioner provided his petition to prison officials for mailing on August 18, 2005 (Dkt. 1 at 25).

[3] § 2254(d) states "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established

Penalty Act of 1996 (AEDPA), this court's review of the state court's factual findings must be highly deferential. Such findings are presumed to be correct unless rebutted by clear and convincing evidence. Similarly, the state courts' resolutions of issues of law-including constitutional issues-must be accepted unless they are found to be "contrary to" clearly established precedent of the Supreme Court of the United States or involved an "unreasonable application" of such precedent. *Williams v. Taylor*, 529 U.S. 362 (2000). It is not enough that the federal courts believe that the state court was wrong; it must be demonstrated that the state court decision was "objectively unreasonable." *Id.*; *Breedlove v. Moore*, 279 F.3d 952 (11th Cir. 2002).

**Ineffective Assistance of Counsel Standard**

To prevail on a claim of ineffective assistance of trial or appellate counsel, a Petitioner must meet the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland's* two-part test requires a Petitioner to demonstrate that counsel's performance was deficient and "there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* However, if a claim fails to satisfy the prejudice component, the court need not make a ruling on the performance component.

**Discussion**

**Ground One**

Griner alleges the state trial court violated his right to due process when, over objection, it

---

Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding

allowed the state to introduce evidence of uncharged crimes which suggested he shot the victim during a robbery/drug transaction. On direct appeal, Griner asserted in his Amended Initial Brief that the trial court erred when it permitted the state to introduce evidence, through the testimony of William Mays (hereinafter "Mays"), that on the date of the murder Mays and Petitioner used cocaine and marijuana, and Mays sold a man some cocaine (Resp., Ex. 3). Griner argued that the evidence was irrelevant and prejudicial, and that the state had not filed a notice of its intent to introduce the evidence to establish proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident as required by Section 90.404(2)(c).[4]

Initially, this Court does not have subject matter jurisdiction to address Ground One. A Florida prisoner's claim that evidence of uncharged crimes was introduced in contravention of state law does not present a cognizable claim for federal habeas corpus relief. It is not the province of this federal Court to reexamine state-court determinations on state-law questions. *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991) ("Nor do our habeas powers allow us to reverse [a petitioner's] conviction based on a belief that the trial judge incorrectly interpreted the California Evidence Code in ruling that the prior injury evidence was admissible as bad acts evidence in this case.").

Furthermore, Ground One is procedurally barred because, on direct appeal, Griner did not raise his claim concerning the state trial court's admission of the evidence as a federal issue. The issue was addressed in state law terms. Pursuant to *Duncan v. Henry*, 513 U.S. 364, 365 (1995),

---

[4]90.404(2)(c)1. states "[w]hen the state in a criminal action intends to offer evidence of other criminal offenses under paragraph (a) or paragraph (b), no fewer than 10 days before trial, the state shall furnish to the defendant or to the defendant's counsel a written statement of the acts or offenses it intends to offer, describing them with the particularity required of an indictment or information. No notice is required for evidence of offenses used for impeachment or on rebuttal."

briefing an issue as a matter of state law is not sufficient to exhaust a federal claim on the same

grounds. *Id.*, 513 U.S. at 366 ("If a habeas petitioner wishes to claim that an evidentiary ruling at

a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he

must say so, not only in federal court, but in state court."). *See Baldwin v. Reese*, 541 U.S. 27 (2004).

Claims that are procedurally defaulted in state court are not reviewable by this Court unless

the petitioner can demonstrate cause for the default and actual prejudice, *Wainwright v. Sykes*, 433

U.S. 72 (1977), or can establish the kind of fundamental miscarriage of justice occasioned by a

constitutional violation that resulted in the conviction of a defendant who was "actually innocent"

contemplated in *Murray v. Carrier*, 477 U.S. 478, 496 (1986). Griner has not done so.

Further and alternatively, Griner does not make a threshold showing of entitlement to relief

under the AEDPA standards. Griner cannot show the state court decision on Ground One was an

unreasonable application of established Supreme Court precedent.  While the Supreme Court has

addressed whether prior acts testimony is admissible under the Federal Rules of Evidence, *see Old*

*Chief v. United States*, 519 U.S. 172 (1997); *Huddleston v. United States*, 485 U.S. 681 (1988), the

Court has not explicitly addressed admission of "uncharged acts" evidence in constitutional terms.

Because there is no Supreme Court precedent that the state decision in Griner's case could be deemed

"contrary to" under the AEDPA standards, Griner is unable to make a threshold showing of

entitlement to relief. *See e.g., Bugh v. Mitchell*, 329 F.3d 496, 512-513 (6th Cir. 2003)(reaching

similar conclusion with regard to state decision on claim that admission of evidence concerning

similar, uncharged acts of child molestation by Bugh violated due process rights to a fundamentally

fair trial), *cert. denied, Bugh v. Bradshaw*, 540 U.S. 930 (2003); *see also, Powell v. Sec'y*, 131 Fed.

Appx. 146 (11th Cir. 2005) (where no Supreme Court precedent is on point, court cannot say a state

11

court's conclusion is contrary to clearly established federal law as determined by Supreme Court).

Moreover, state-court evidentiary rulings generally cannot rise to the level of due process violations unless they offend some principle of justice so "rooted in the traditions and conscience of our people" as to be ranked as fundamental. *See Montana v. Egelhoff*, 518 U.S. 37, 43 (1996) (quoting *Patterson v. New York*, 432 U.S. 197 (1977)). Federal habeas corpus relief is not available to correct an error of state law unless the error is so egregious as to deny due process or equal protection. *Pulley v. Harris*, 465 U.S. 37 (1984). Griner's case does not raise such concerns. Accordingly, Ground One does not warrant federal habeas corpus relief.

**Ground Two**

Griner alleges he was denied due process because the state failed to prove all of the elements of second degree murder, specifically, that he acted with a deprived mind, ill will, hatred, or evil intent.[5]

The Due Process Clause of the Fourteenth Amendment prohibits a criminal conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime." *In re Winship*, 397 U.S. 358, 364 (1970). In a challenge to a state criminal conviction brought pursuant to Section 2254, a petitioner is entitled to habeas relief on a claim of insufficient evidence "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). "[T]his inquiry does not require a court to 'ask itself whether *it* believes that the evidence at trial established

---

[5]Section 782.04(2), Florida Statutes states in pertinent part "[t]he unlawful killing of a human being, when perpetrated by any act imminently dangerous to another and evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual, is murder in the second degree..."

guilt beyond a reasonable doubt.'" *Jackson v. Virginia*, 443 U.S. at 318-19 (quoting *Woodby v. INS*, 385 U.S. 276, 282 (1966) (emphasis in original)).

Sufficiency of the evidence claims are governed by the substantive elements of a criminal offense as defined by state law. *Jackson v. Virginia*, 443 U.S. at 324 n. 16. "Although each element of the offense must be established beyond a reasonable doubt, *see Bishop v. Kelso*, 914 F.2d 1468, 1470 (11th Cir. 1990) (citing *Jackson [v. Virginia]*, 443 U.S. at 316), the State is not required to rule out every hypothesis except that of the guilt of the defendant, *see Jackson [v. Virginia]*, 443 U.S. at 326)." *Johnson v. Alabama*, 256 F.3d 1156, 1172 (11th Cir. 2001). If the record contains facts supporting conflicting inferences, the jury is presumed to have resolved those conflicts in favor of the State and against the defendant. *Johnson v. Alabama*, 256 F.3d at 1172. In other words, federal courts must defer to the judgment of the jury in assigning credibility to the witnesses and weighing the evidence. *Johnson v. Alabama*, 256 F.3d at 1172 (citing *Jackson v. Virginia*, 443 U.S. at 326).

Griner does not deny the state established that he shot the victim. Among the witnesses presented at trial, Mays testified that Griner and the victim were standing behind and a little off to his side while Mays was trying to sell drugs to another individual (Resp., Ex. 1, Vol. V at pp. 402-09). Mays then heard the victim and Griner exchanging words and Griner cussing at the victim (Id. at p. 406). Mays then heard gunshots from behind him and saw the victim in front of him fleeing the area. Griner was the only person behind him (Id. at p. 408). Mays heard two or three shots (Id. at p. 409). Mays then fell down because he was shot (Id.).

Dr. Wilson Broussard, the medical examiner who performed the autopsy on the victim, testified that the victim's death was caused by a gunshot wound to the chest. The bullet entered the victim's buttock region in the back and traveled upward and perforated the victim's heart, liver and

13

lungs (Resp., Ex. 1, Vol. VI at 454). Dr. Broussard also testified the victim was shot a second time on the back of his leg (Id. at 458-59). He also testified that the victim was facing away from the shooter when he was shot (Id. at 465-66). There was no evidence presented at trial that the victim was armed or threatened Griner in any way.

Viewing the state's evidence of Petitioner's guilt in the light most favorable to the state and using the objective reasonableness test, a rational trier of fact could find Petitioner committed second degree murder, the crime for which he stands convicted. *Cf. Thompson v. State*, 944 So. 2d 546 (Fla. 4th DCA 2006)(evidence supported the conclusion that defendant acted with a depraved mind where defendant shot victim because she was angry with him, and at the time of the shooting, victim was no threat to defendant). The state appellate court's affirmance of Petitioner's conviction was neither an unreasonable application of controlling Supreme Court precedent or an unreasonable determination of the facts.

**Grounds Three through Fourteen - Ineffective Assistance of Counsel Claims**

**a. Ground Three**

Griner alleges counsel was ineffective for failing to challenge the admission into evidence of the victim's dying declaration that Griner had shot him. The state trial court ruled on this claim:

> In his present Motion, the Defendant raises thirteen grounds of ineffective assistance of counsel under which he claims he is entitled to collateral relief from his conviction and sentence. None of these grounds has any merit. Therefore, the Court will deny the Defendant's Motion as set forth in more detail below.
>
> As an initial matter, the Court notes that in order to state a successful claim for ineffective assistance, the Defendant must first identify omissions by his attorney that were outside the "broad range of reasonably competent performance under prevailing professional standards." *See Kennedy v. State*, 547 So. 2d 912, 913 (Fla. 1989) (citing *Strickland v. Washington*, 466 U.S. 668 (1984)). The defendant must further prove that the omission "so affected the fairness and reliability of the

14

proceeding that confidence in the outcome is undermined." *Id.* at 913 (citing *Strickland*). The court need not make a specific ruling on the performance by trial counsel when "it is clear that the prejudice component is not satisfied." *Id.* at 914. The court considering an ineffective assistance of counsel claim must apply a strong presumption that counsel's conduct fell within the range of reasonable professional assistance. *See Stare v. Hanania*, 715 So. 2d 984, 985 (Fla. 2d DCA 1998).

**Ground One**: Defendant claims counsel was [sic] failed to move to "suppress" an alleged dying declaration and the "false testimony offered up in support of it." (Motion at p. 5) Defendant concedes that a pretrial hearing was held on October 25, 2002, on the issue of the admissibility of the dying declaration. He contends that his counsel made no effort to "seriously challenge" whether the statement was made by the victim but, rather, counsel was "more interested in proper motion practice" and merely argued that the testimony was in conflict. (Motion at p. 6) Defendant argues that had counsel examined all of the depositions, witness statements, EMS records and all of the facts and circumstances surrounding the shooting, he would have determined that Deputy Vreeland and Lieutenant Evers both lied under oath during this hearing.

First, the Defendant fails to offer any basis upon which counsel could have "moved to suppress" the statement of the deceased victim. Counsel could have moved in limine to preclude the admission of the statement. Nevertheless, the State filed a pretrial motion to address the admissibility of the statement, and the matter came before the Court. Next, the Defendant contends that his counsel did not effectively challenge the admissibility, but merely argued that the testimony was in conflict. The Defendant's claim is not supported by any facts in the record. In fact, the record conclusively refutes any suggestion that either Vreeland or Evers "lied" during this hearing.

Defendant relies first upon an "Event Chronology" from the Manatee County Sheriff's Office to argue that the EMS personnel had removed Dixon before Evers arrived at the scene. The Chronology contains times and various codes for the units that responded to the scene; however, none of the unit codes are explained on the document, nor does the Defendant identify what codes corresponded to what type of unit or the particular officer who responded to the scene. Consequently, the Court finds the document does not support the Defendant's claim, much less that it "clearly shows" Evers arrived after EMS had transported Dixon.

Next, the Defendant relies on Detective Carpenter's supplemental report (dated 6/21/01), alleging that the report states that Evers only overheard a black female asking Dixon who shot him and Dixon's answer, "Dewey." Thus, Defendant argues Evers lied when he said he [sic] Dixon identified Dewey directly to him. The Court rejects the Defendant's reliance on Carpenter's report. First, the report was

15

never introduced as evidence in any hearing or at trial. Second, Carpenter's sworn affidavit, which led to the issuance of the arrest warrant in this case, clearly states that Dixon told both Deputy Vreeland and Lieutenant Evers of the Manatee County Sheriff's Office that the person who shot him was named "Dewey" and was a "bright skinned black male."

Finally, the Defendant relies on selected snippets of Lieutenant Evers' deposition testimony to argue that Evers was really somewhere else when he allegedly overheard Dixon tell Tabatha Walker that Dewey shot him. The Court rejects this argument as well because the questioning on page 14 of the deposition clearly indicates that Evers was in contact with and spoke to Dixon *prior* to EMS and Walker arriving at the scene.' Evers indicates, "As soon as EMS got there, came over, I stood up because I was close to him. Vreeland and I were in the way of them doing their job, so we both backed up." (Evers' Dep., P. 14, LL. 22-24) It was after that point that Tabatha Walker spoke to Dixon. Again, this is verified by Detective Carpenter's affidavit in support of the arrest warrant, where she noted that Tabatha Walker also asked Dixon who shot him and he told her that Dewey shot him.

In sum, the Defendant relies on unsupported allegations that Deputy Vreeland and Lieutenant Evers fabricated their testimony to allege that counsel was ineffective. Not only are his allegations unsupported, they are conclusively refuted by documents and testimony in the record. Consequently, the Court finds that the Defendant was not prejudiced by counsel's alleged failure to challenge Dixon's dying declaration by failing to explore non-existent inconsistencies in the record.

(Resp., Ex. 10 at pp. 2-5).

After an evidentiary hearing on the matter, the trial court specifically ruled that the victim's statements that Petitioner shot him were admissible under the "dying declaration" exception to the hearsay rule (Resp., Ex. 1, Vol. II at pp. 240-41). Therefore, Petitioner fails to demonstrate that counsel was ineffective for "failing to challenge" the admissibility of the victim's statements.

### b. Ground Four

Griner asserts counsel was ineffective for failing to interview and depose Mays prior to trial. Plaintiff argues that as a result, counsel failed to discover Mays's prior criminal history and that Mays had a firearm and could have been the person who shot the victim. The state trial court ruled

16

on this claim:

> **Ground Two**: Defendant claims counsel failed to interview and/or depose a key witness (William Mays) prior to trial, failed to discover Mays' [sic] prior criminal history, and was unprepared to cross-examine Mays at trial. Defendant claims counsel knew that Mays was listed as a State witness for over one year prior to trial, but he failed to depose him. Mays placed the Defendant at the scene of the shooting. Defendant claims that had counsel fully investigated Mays, he would have discovered that Mays lied to the police, lied in his testimony at trial, and that there was a good possibility that Mays himself shot the victim.
>
> One important factor the Defendant fails to note in his argument is that Mays, the only "eyewitness" to the shooting, had been missing throughout the discovery period in this case and the State had been unable to locate him. (T.T. 6)  On the first day of trial, the State informed the Court that there was a "strong likelihood" that William Mays might be found within the hour. (T.T. 14)  Mr. Mays then appeared in court after the noon lunch break during the jury selection process. (T.T. 84)  Near the end of the day after jury selection was completed, defense counsel was able to commence with the deposition of Mays. (T.T. 118-119)  The following morning, defense counsel moved for a continuance based on the deposition of Mays and the fact that several names arose during the course of the deposition, which counsel indicated he wanted to investigate as potential witnesses for the defense. (T.T. 138-146)  After hearing argument from defense counsel and the State, the Court denied the Motion. (T.T. 144-145)
>
> Due to Mays' [sic] unavailability prior to trial, it was impossible for counsel to investigate him or depose him until the day trial began. Therefore, whether or not he had been listed as a witness for over a year prior to trial is irrelevant. The record reflects that counsel deposed Mays and moved for a continuance based on Mays' [sic] deposition testimony. When this was denied, counsel impeached Mays at trial by focusing, both in cross-examination and in closing argument, on the inconsistencies between his initial statements to the police after the crime, his deposition testimony, and his trial testimony. (T.T. 417-432,547-554) Based on the record, the Court does not find the Defendant was prejudiced by counsel's performance.

(Resp., Ex. 10 at pp. 5-6).

Counsel was unable to depose Mays before the start of the trial because Mays had been missing until the start of the trial (Resp., Ex. 1, Vol. III at p. 112). When Mays appeared for the trial, counsel moved to take his deposition (Id. at p. 113-14).  After taking his deposition, counsel moved

17

to continue the trial based upon the information he discovered from Mays during the deposition, but the trial judge denied the motion to continue (Resp., Ex. 1, Vol. IV at pp. 138-45). At trial, counsel thoroughly cross-examined Mays and established that Mays was high on drugs at the time of the shooting, never saw Petitioner with a gun on the night of the shooting, and did not actually see Petitioner shoot anyone (Resp., Ex. 1, Vol. V at pp. 417-432). Accordingly, Petitioner fails to demonstrate that counsel was ineffective for failing to interview and depose Mays prior to the time of trial, and fails to demonstrate prejudice.

### c. Ground Five

Griner asserts counsel was ineffective for failing to object to Allen Moss's testimony that Griner went to the scene of the shooting to rob the victim. Griner argues the testimony was highly prejudicial because it allowed the jury to believe he shot the victim in a failed robbery attempt, and the testimony was irrelevant because he never was charged with or convicted of attempted robbery. The state trial court ruled on this claim:

> **Ground Three**: Defendant claims counsel failed to object to the introduction of irrelevant and highly prejudicial testimony of collateral crimes evidence as testified to by witness Allen Moss at trial. Defendant claims that the State introduced testimony from Moss that he and the Defendant were there to "rob the guy that didn't make it" at the time the victim was shot. Defendant claims Moss established a motive for the shooting, *i.e.*. a robbery, and he was prejudiced by the introduction of this testimony because the jury was allowed to believe that he shot Dixon in a failed robbery attempt.
>
> The State presented Allen Moss to testify to statements allegedly made by the Defendant to Moss while both were incarcerated in the Sarasota County Jail. (T.T. 354-360) Allegedly, the Defendant opened up to Moss and told him about the murder and that he and Mays had planned to rob the victim, Vernon Dixon. (T.T. 361-364) Allegedly, the Defendant allegedly had some prior problem with Dixon and planned the incident in question. (T.T. 366-367)
>
> On cross-examination, Moss admitted that he had been convicted of several

felonies (later established as 11). (T.T. 369-371, 384-385, 389) He also exposed a possible bias in Moss's testimony in that Moss hoped to help out another fellow jail inmate by providing information to the authorities about the Defendant. (T.T. 371-375, 377-379) Moss also admitted that when the Defendant first came into the Sarasota County Jail, he denied that he had anything to do with the incident. (T.T. 379-380) It wasn't until a few days later that he allegedly told Moss what had happened. (T.T. 380)

On re-direct, Moss testified, over objection, that in telling him about the killing, the Defendant exhibited no remorse about it and had laughed about it. (T.T. 387-388) Defense counsel later argued the implausibility of Moss' [sic] testimony, as well as the inconsistency of that testimony with the testimony of other witnesses, during his closing argument. (T.T. 549-550)

The Defendant fails to present any legal basis upon which counsel could have objected to the admission of Moss' [sic] testimony. This testimony concerned a statement allegedly uttered by the Defendant, which was admissible as an admission of a party opponent. See § 90.803(18), Fla. Stat. (2001); *see also Moore v. State*, 701 So. 2d 545, 549 (Fla. 1997). Here, the admission did not tend to show propensity or bad character, but it was directly relevant to whether or not the Defendant committed the murder of Dixon. Consequently, the statement was relevant and admissible. Moreover, the Court properly instructed the jury about evaluating the statement during its charge. (T.T. 588)

(Resp., Ex. 10 at pp. 6-7).

Because Moss's testimony that Griner had told him that he went to the scene of the shooting to rob the victim was admissible as an admission of a party opponent, counsel had no basis to object to the admission of that testimony. Accordingly, Griner fails to demonstrate counsel was ineffective for failing to object to Moss's testimony.

### d. Ground Six

Griner claims counsel was ineffective for failing to interview or depose Tabatha Walker who he claims was the individual who the police officers claimed was informed by the victim that Griner had shot him. Griner asserts he was prejudiced because counsel could not properly cross-examine Walker without having first interviewed or deposed her. The state trial court ruled on this claim:

**Ground Four**: Defendant claims counsel failed to interview and/or depose state witness, Tabatha Walker, prior to trial. Defendant avers that Walker was a key witness because Dixon allegedly told her that the Defendant shot him. Defendant claims counsel's failure to depose Walker prejudiced him because he was deprived of his right to properly cross-examine Walker as to Dixon's alleged statement as to who shot him. The Defendant's claim is inaccurate and is conclusively refuted by the trial record.

Defense counsel objected at the inception of Walker's testimony on the basis that the State had committed a discovery violation by not providing the defense with a viable address for Walker. (T.T. 218-219) After considering the testimony of the State's investigator and the argument of counsel, the Court found that if any violation had occurred, it was inadvertent, not willful or substantial, and the defense had not been prejudiced thereby. (T.T. 219-226)

Walker then testified that while she heard what she thought were firecrackers outside her apartment on the night of the shooting, she did not observe the shooting itself. (T.T. 232) She and some others from her apartment went outside with a flashlight and saw the victim's vehicle, then located his car keys and cell phone on the ground. (T.T. 234-237) Walker then called 9-1-1 and walked around to the front of her apartment to wait for the police; it was at that point she saw a paramedic truck down the road. (T.T. 237) As she approached the area, she saw the victim, Vernon Dixon, lying at the front door of someone's house. (Id.)

Never did Tabatha Walker testify that Dixon identified the Defendant to her as his shooter. Therefore, the Defendant has failed to establish any prejudice as to counsel's alleged failure to cross-examine Walker on this issue.

(Resp., Ex. 10 at pp. 7-8).

The record reflects that prior to the trial counsel unsuccessfully attempted to subpoena Tabatha Walker at several addresses provided to him by the state (Resp., Ex. 1, Vol. IV at pp. 219). Moreover, Tabatha Walker did not testify that the victim told her that Griner had shot him (Id. at pp. 218-49). Accordingly, Griner fails to demonstrate counsel was deficient for failing to depose Tabatha Walker, or that he was prejudiced because counsel failed to depose her.

**e. Ground Seven**

Griner alleges counsel was ineffective for stipulating that Griner's fingerprints were found

20

in the car in which police officers found Mays after he had been shot. Griner argues that stipulating

to that fact bolstered the state's case and allowed the jury to assume that Griner was in the car after

the victim and Mays had been shot. He also argues counsel was ineffective for failing to request that

the court give a jury instruction explaining that Griner only admitted to being in the car prior to the

shooting. The state trial court ruled on this claim:

> **Ground Five:** Defendant claims counsel erred in stipulating, over his
> objection, that the Defendant's prints were located on a blue Toyota because the
> prints placed him in the vehicle with William Mays at the time the alleged shooting
> occurred. Defendant claims prejudice because he never denied being in the Toyota
> but, due to the stipulation, he was unable to question the crime scene technician as
> to when the fingerprints were left in the vehicle thus leaving the jury with the
> impression that they were left on the night of the shooting.
>
> The Court initiated the concept of the parties entering a stipulation regarding
> the fingerprints. (T.T. 441) Defense counsel represented to the Court that "Mr. Griner
> would agree to stipulate" that his fingerprints were found on the vehicle. *(Id.)* The
> State and defense worked out the wording of the stipulation in the Defendant's
> presence, and the Court then read the entire stipulation on the record to see if it was
> agreeable to both sides. (T.T. 442-445)   Specifically, after the Court read the
> stipulation, both the State and defense counsel, *as well as the Defendant himself,*
> indicated that the stipulation was agreeable. (T.T. 445) The Court then read the
> stipulation to the jury before the close of the State's case. (T.T. 474-475)
>
> The record conclusively refutes the Defendant's claim that counsel entered
> into this stipulation over his objection. The Defendant specifically agreed to the
> stipulation. The fact that he now regrets that decision does not render his counsel's
> actions deficient. Therefore, the Court rejects Ground Five of the Defendant's
> Motion.

(Resp., Ex. 10 at pp. 8-9).

The state court correctly noted that Griner specifically agreed to the stipulation and the trial

court's instruction to the jury regarding the stipulation (Resp., Ex. 1,Vol. VI at p. 445). Moreover,

Griner's claim that after the stipulation was read to the jury, the jury assumed that Griner was in the

car after Mays had been shot is wholly speculative. Accordingly, Griner fails to demonstrate counsel was ineffective for stipulating that Griner's fingerprints were found in the car, and for failing to request a limiting jury instruction. Moreover, Griner fails to demonstrate prejudice.

### f. Ground Eight

Griner claims counsel was ineffective for failing to interview or depose any of the medical personnel who treated Mays after he was shot regarding whether a bullet was removed from Mays's body, and if so, whether the bullet was the same type as the bullet removed from the victim's body. Griner argues that if the bullets were different, then it would show that he did not shoot both the victim and Mays, and that it was possible Mays and the victim shot each other. The state trial court ruled on this claim:

> **Ground Six:** Defendant claims counsel failed to investigate, interview, or depose medical personnel that treated William Mays for a gunshot wound to determine the type of weapon used, how far Mays was from the shooter when he was shot, and whether a bullet was removed from Mays' [sic] body. Defendant states that two shell casings were found at the scene and, if the bullet that struck Mays was fired from a .45 caliber weapon, it would have supported his theory that Mays and Dixon shot at each other and that the Defendant was not the person that killed Dixon.

> Defendant never proffered a theory that Mays and Dixon shot each other. Defendant presented an alibi witness during his case that testified that the Defendant could not have been the shooter because he was at her house from approximately 8:00p.m. on the night of the shooting until at least noon the following day. (T.T. 491-500) In closing, defense counsel focused on the State's failure to prove its case and floated the theory that the victim was shot by someone on the roof of one of the adjacent duplexes. (T.T. 544-559) In light of the fact that the Defendant's present allegations do not accurately reflect his trial strategy, the Court does not find he was prejudiced by counsel's alleged failure to discover all the particulars of Mays' [sic] shooting.

(Resp., Ex. 10 at pp. 9-10).

Strategic decisions rendered by counsel after a complete review of relevant laws and facts

22

are "virtually unchallengeable." *Strickland*, 466 U.S. at 690-91. Petitioner cannot meet his burden by showing that counsel could have chosen a different course at trial. *White v. Singletary*, 972 F.2d 1218, 1220-21 (11th Cir. 1992). Rather, Petitioner must show that counsel did not do what was constitutionally compelled to provide adequate counsel. *Accord Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc) (quoting *Burger v. Kemp*, 483 U.S. 776, 794 (1987)).

Griner fails to show counsel's decisions were anything but trial strategy. Moreover, even if counsel was deficient for failing to interview the medical personnel, Griner wholly fails to show prejudice because his claim that a bullet might have been removed from Mays's body, and the bullet might have been a different type than the bullet removed from the victim's body is purely speculative. *See Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991)(recognizing that vague, conclusory, speculative, or unsupported claims cannot support an ineffective assistance of counsel claim).

### g. Ground Nine

Griner claims counsel was ineffective because he should have known that Stephanie Stewart, the Florida Department of Law Enforcement firearm and toolmark examiner, contradicted herself when she testified that without having the gun, she could not tell whether a cartridge case and a projectile were fired from the same gun, and then later testified that the six shell casings found at the scene of the crime were fired from the same gun. The state trial court ruled on this claim:

> **Ground Seven**: Defendant claims counsel failed to cross-examine Stephanie Stewart regarding her inconsistent testimony. Defendant claims Stewart testified that without a firearm, you cannot tell whether a cartridge case and a projectile were fired from the same weapon. Then, on re-direct, she testified that the six nine-millimeter shells recovered in this case were fired from the same weapon. Defendant claims that counsel should have objected to this testimony because no gun was ever recovered in this case. Defendant's claim has no merit.

23

Stephanie Stewart was the FDLE firearm and toolmark examiner who examined the fired pieces of ammunition recovered from the scene of the shooting in this case. (T.T. 337-341) Ms. Stewart first denoted the difference between a cartridge case and a projectile or bullet. (T.T. 338) A cartridge case holds the powder and the projectile (bullet) before it is fired; once a semi-automatic firearm fires the projectile, the cartridge case is expelled from the firearm. (T.T. 338-339) Stewart testified that without having the weapon, she cannot tell whether a cartridge case and a projectile (bullet) were fired from the same weapon. (T.T. 339) However, she testified that she does not need the weapon to determine whether multiple cartridge cases were fired from the same weapon because the cartridge cases will leave marks from the firearm that are unique to that particular firearm. (Id.)

She then identified State's Exhibits 2A through 2F as six 9 millimeter Luger cartridge cases she had previously examined. (T.T. 341-342) After examining them under a comparison microscope, she concluded that all six shells were fired from the same firearm. (T.T. 342-343) She based this conclusion on the markings located on the outside of the cartridge case, which were the same on each casing. (Id.)

After a careful reading of the transcript, the Court rejects the Defendant's claim that counsel was deficient for failing to object to Stewart's "inconsistent" testimony. Her testimony that she could not match a projectile to a cartridge case without a firearm is not inconsistent with her testimony that she could tell whether several cartridge cases were fired from the same weapon. Consequently, counsel had no basis for the objection Defendant now alleges he should have made.

(Resp., Ex. 10 at pp. 10-11).

Because Stephanie Stewart's testimony was not inconsistent, there was nothing for counsel to object to regarding her testimony. Accordingly, Griner wholly fails to show counsel was deficient for failing to object to or otherwise challenge Stephanie Stewart's testimony.

### h. Ground Ten

Griner alleges counsel was ineffective for failing to interview any witnesses regarding whether a bullet was recovered from Mays's body after he had been shot. Griner argues that if a bullet had been recovered from Mays's body, it might have established that Mays was shot with a .45 caliber weapon. Griner asserts that the victim owned a .45 caliber weapon, that Mays owned a

24

9 millimeter weapon, and therefore the evidence could have established that Mays shot the victim after the victim shot Mays. The state trial court ruled on this claim:

> **Ground Eight:** Defendant claims counsel failed to investigate witnesses and facts to support a defense on his behalf. Defendant claims that a .38 caliber bullet was removed from the victim's body in this case. Defendant further claims that William Mays, who was also shot in the incident, owned a nine-millimeter semi-automatic weapon and the deceased victim Dixon owned a .45 caliber firearm. Defendant contends counsel failed to discover this information, and this resulted in there being no evidence presented at trial as to the weapon that fired the bullet that struck Mays, thus rendering him unable to challenge the State's case against him.
>
> First, the Defendant's claim is legally insufficient. Defendant claims counsel "failed to discover" this evidence, but does not allege that he ever informed counsel that either Dixon or Mays owned or possessed such weapons. Second, because the Defendant was not charged with shooting William Mays, the Defendant fails to set forth the relevance of the caliber of the bullet that struck Mays. Finally, even if the Defendant's claim were legally sufficient, the record refutes the Defendant's claims. Deputy Vreeland testified that he found no weapon on Dixon after the shooting. (T.T. 189-190) Moreover, in all of his pretrial statements to the police and his deposition, William Mays denied having a gun in his possession on the night in question.

(Resp., Ex. 10 at pp. 11-12).

As was the case in Ground Eight, Griner's claim that a witness might have testified that a bullet was recovered from Mays's body, and the bullet was different than the type of bullet recovered from the victim's body is wholly speculative. Moreover, the state court correctly noted that Griner never alleged that he informed counsel that Mays and the victim owned guns and possessed them at the time of the shooting. Furthermore, the record demonstrates that there was no evidence that Mays or the victim were in possession of a gun at the time of the shooting. Accordingly, Griner wholly fails to show counsel's performance was deficient.

### i. Ground Eleven

Griner alleges counsel was ineffective for failing to adequately move for a judgment of

25

acquittal at the close of the state's case.  Griner argues counsel should have filed a motion setting

forth the claim that the evidence was insufficient to convict Griner of murder because no weapon

was ever found, no witness ever testified that Griner possessed a weapon, and none of the witnesses

testified that they actually saw Griner shoot the victim. The state trial court ruled on this claim:

> **Ground Nine:** Defendant claims counsel failed to file or otherwise move for "a proper judgment of acquittal" at the close of the State's case. Defendant concedes that counsel moved for a judgment of acquittal, but alleges he failed to "have a fully prepared motion ready to file with the court" and did not argue that the evidence was insufficient to convict the Defendant of a depraved mind murder. Defendant claims he was prejudiced because the State had not presented a prima facie case that the Defendant owned or had a firearm in his possession at the time of the shooting or even that the Defendant shot the victim. Defendant argues that had counsel presented a better motion for judgment of acquittal, "most likely" the Court would have granted the motion or, at least, have reduced the charge from a life felony to a felony of the first degree.
>
> At the close of the State's case, counsel moved for a judgment of acquittal (MJOA) arguing that "based upon the evidence that's been presented by the State, that they have failed to present sufficient evidence to allow the charge to go to the jury, and for that reason, as far as the charged crime, that that should be removed from the jury's deliberation." (T.T. 475) Counsel had no case law to present to the Court regarding the specific factual scenario involved in this case. (T.T. 475-476) The Court denied the MJOA, noting in part:
>
>> All right, well, there being no authority one way or another presented to me to show that it's not a prima facie case, it seems to me the elements have been met when viewed in a light most favorable to the State. There has been conflicting testimony in regard to some of the matters; in that I agree. But that in itself is not sufficient for the Court to just toss the case; it's for the jury to consider whether they believe the case has been proven beyond a reasonable doubt. So for that reason I'll deny the motion for judgment of acquittal.
>
> (T.T. 476)
>
>
> The basis for a motion for judgment of acquittal is the sufficiency of the evidence in the State's case. Whether such a motion is granted "depends upon whether the State has met its burden of proof by making out a     prima facie case

against the defendant. . . ." *Weinshenker v. State,* 223 So. 2d 561, 563 (Fla. 3d DCA 1969); *see also Leonard v. State, 731 So.* 2d 712,717 n.2 (Fla. 2d DCA 1999) (all reasonable inferences from the evidence are drawn in favor of the State). If the State has brought forth sufficient evidence to support its claim that each element of the crime has been performed, a judgment of acquittal will not lie. *See Cunningham* v. *State,* 385 So. 2d 721,722 (Fla. 3d DCA 1980); *see also State* v. *Williams,* 742 So. 2d 509, 511 (Fla. 1" DCA 1999).

In this case, the record reflects that the Court accurately and appropriately applied the above standard in denying the Defendant's motion for judgment of acquittal. The Defendant's generalized complaints fail to establish any prejudice, nor does he cite any case law that would have aided counsel in persuading the Court to grant his motion. Therefore, the Court rejects this ground.

(Resp., Ex. 10 at pp. 11-13).

Counsel moved for a judgment of acquittal at the close of the state's case. Therefore, Petitioner fails to show that counsel's performance was deficient. Moreover, Petitioner fails to show prejudice because the state's evidence supported each element of the offense charged.

**j. Ground Twelve**

Griner alleges counsel was ineffective for failing to interview the paramedics who responded to the scene of the shooting and treated the victim. He argues that the paramedics would have testified that Lt. Evers was not present at the scene when they arrived and when they took the victim to the hospital. Griner essentially raised this claim in Ground Ten of his Rule 3.850 motion, claiming that his counsel was ineffective for failing to interview or depose the paramedics, and for failing to obtain copies of the EMS log sheets, in order to impeach Lt. Evers as to when he arrived at the crime scene (Resp., Ex. 9 at pp. 26-27). The state trial court ruled on this claim:

**Ground Ten:** Defendant claims counsel failed to interview and/or depose paramedics that responded to the shooting and to secure EMS log sheets. Defendant claims he told counsel the paramedics could testify as to the time they arrived and who was present at the time. Defendant claims this testimony would have disputed

or contradicted the testimony of Lieutenant William Evers by proving the victim had already been removed by the time he arrived on the scene. It was Evers who claimed that the victim, Vernon Dixon, told him that "Dewey" shot him before being removed from the scene by paramedics.

Marilyn Heiler, in whose doorway Dixon collapsed, testified that the police responded to her 9-1-1 call within five minutes, and Dixon was alert and talking to the police while the paramedics were attending him. (T.T. 164-165) Deputy Vreeland testified that his dispatch time to the scene was 1:25 a.m. (T.T. 177) After locating the victim, he attempted to give some first aid as he arrived before any EMS unit came upon the scene. (T.T. 178-179) Vreeland testified that Evers arrived on the scene and, in response to Evers' question as to who shot him, Vreeland heard Dixon utter the name "Dewey" once or twice. (T.T. 180-182)

Deputy George McCorkle also testified that he arrived on the scene at approximately the same time Vreeland arrived. (T.T. 191-193) He testified that Lieutenant Evers arrived immediately thereafter, and all three of them were on the scene before EMS personnel arrived. (T.T. 193-194) Evers testified that he ascertained the victim's name and then asked Dixon who shot him; the victim responded, "Dewey." (T.T. 202) He also indicated that his assailant had "bright skin." (T.T. 203) Evers asked some additional questions, but Dixon had a hard time responding because he was having difficulty breathing. (T.T. 203-206) Finally, Evers testified that while he was speaking with Dixon, a black male and a black female, identified as Tabatha Walker, approached the scene and also identified the victim as Vernon Dixon. (T.T. 205-206)

The essence of Defendant's claim is that the victim (Dixon) had been removed from the scene before Evers arrived. Therefore, Defendant contends Evers' trial testimony was fabricated. As noted above, however, the trial testimony of other witnesses conclusively refutes the "facts" as alleged by the Defendant.

(Resp., Ex. 10 at pp. 14-15).

Petitioner's allegations are insufficient to support relief on this claim. "[E]vidence about the testimony of a putative witness must generally be presented in the form of actual testimony by the witness or an affidavit. A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim." *United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991) (footnotes omitted). Petitioner has failed to present

evidence of actual testimony or any affidavit of alleged testimony from the paramedics, and he therefore has not made the requisite factual showing. Petitioner's self-serving speculation will not sustain a claim of ineffective assistance of counsel. Moreover, the record shows that Deputies Vreeland and McCorkle testified that Lt. Evers arrived at the scene of the shooting before the paramedics arrived (Resp., Ex. 1, Vol. IV at pp. 180-183; 192-194). Accordingly, Petitioner fails to demonstrate deficient performance by counsel and prejudice.

### k. Ground Thirteen

Griner claims counsel was ineffective for failing to request that the trial court give a jury instruction that a prior inconsistent statement by one of the state's witnesses was relevant only to the witness's credibility and not evidence of Griner's guilt. Griner raised a similar claim in Ground Eleven of his Rule 3.850 motion, claiming that his counsel was ineffective for failing to request a jury instruction that Stacy Walker's prior inconsistent statements were relevant only to her credibility and not evidence of Griner's guilt (Resp., Ex. 9 at pp. 27-28). The state trial court ruled on this claim:

> **Ground Eleven:** Defendant claims counsel failed to request a jury instruction that a prior inconsistent statement by a State witness was relevant only to the witness's credibility and was not evidence of the Defendant's guilt. Defendant focuses on the testimony of Stacy Walker. During her direct testimony, she testified that the Defendant came to her door and asked her to take "Heavy" (William Mays) to the hospital. Defense counsel, however, elicited on cross-examination that when Walker originally spoke with the police on the night of the incident, she told them Heavy came to her door, said he was shot, and asked for help. Defendant claims that counsel should have asked the Court for a jury instruction at that point to the effect that the inconsistent statement was relevant only to credibility and not to prove the Defendant's guilt.

> This claim has no merit. The Defendant provides no legal basis upon which his counsel could have requested such an instruction during the cross-examination of Walker, and the Court finds there was no legal basis for a cautionary or limiting

instruction at that time. Moreover, the Court fully instructed the jury on evaluating the credibility of witnesses during its charge. (T.T. 586-587) Specifically, the Court instructed the jury that they could consider such things as whether the witness had an opportunity to see and know the things about which he/she testified; whether the witness was honest and straightforward; whether the witness had some interest in the case; whether the witness's testimony agreed with the testimony of other witnesses; and whether the witness had, at some other time, made a statement that was inconsistent with the testimony the witness rendered in court. *(Id.)*

Other than a conclusory claim that counsel should have requested a limiting instruction at the precise moment counsel impeached Walker with her prior inconsistent statements, the Defendant fails to set forth any facts to establish that he was prejudiced by the Court's instruction as set forth above. Therefore, the Court rejects this ground.

(Resp., Ex. 10 at pp. 15-16).

It appears Griner attempts to argue that because Stacy Walker gave testimony at trial that was inconsistent with prior statements she gave to the police, his counsel should have requested that the court instruct the jury that Stacy Walker's inconsistent statements were relevant only to her credibility, and the jury could not consider her statement at trial as evidence of Griner's guilt. Griner argues that Stacy Walker's testimony at trial prejudiced him because it was the only testimony, other than Mays's testimony, placing Griner with Mays at the time Mays and the victim were shot.

In Florida, "[p]rior inconsistent statements are not hearsay and can be admitted as substantive evidence '*if* the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement *and* the statement is . . . [i]nconsistent with the declarant's testimony *and* was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding or in a deposition.'" *Pearce v. State*, 880 So. 2d 561, 569 (Fla. 2004)(quoting Section 90.801(2)(a), Fla. Stat. (2001))(emphasis in original). "However...a statement given under oath during a police investigation is not a statement given at an 'other proceeding' and consequently is not admissible

as substantive evidence under section 90.801(2)(a)." *Id.* Therefore, the statement Stacy Walker gave to the police during the investigation was not admissible as substantive evidence. [6] Her testimony, under oath at trial, that Griner had come to her door and asked her to take Mays to the hospital, however, was admissible as substantive evidence. Accordingly, counsel did not have grounds to request a jury instruction that Stacy Walker's testimony on the matter was relevant only to her credibility and not admissible as substantive evidence of Griner's guilt.

### l. Ground Fourteen

Griner contends counsel filed a motion in limine to preclude any testimony that Griner shot Mays, and Griner claims the trial court granted the motion. He argues counsel, therefore, was ineffective for failing to object to Mays's testimony that Griner shot him, and for failing to object to the prosecutor's comment during closing argument that Griner shot Mays. The state trial court ruled on this claim:

> **Ground Thirteen**: Defendant claims counsel failed to object to the State's assertion in closing argument that the Defendant shot William Mays despite the Court granting the Defendant's motion to preclude any reference to his shooting Mays. This claim is also without merit.
>
> The Defendant mischaracterizes the Court's action on his counsel's motion in limine regarding the shooting of Mays. Counsel argued to preclude any testimony or evidence indicating that the Defendant shot Mays. (T.T. 121-127) The State agreed that it would not present any evidence that the Defendant intentionally shot Mays, but argued Mays' [sic] shooting was relevant. (T.T. 122-127) Initially, the Court reserved ruling on the issue. (T.T. 127) Later, however, the Court denied the Defendant's motion in limine, ruling that the fact of Mays' [sic] shooting would be admissible:
>
> > On the other matter from yesterday, I've reviewed the case law and annotations in regard to the admissibility of Mr. Mays getting shot. I'm going to deny the Motion in Limine, it is relevant

---

[6] Griner's counsel properly used Stacy Walker's prior inconsistent statements to the police to impeach her at trial (Resp., Ex. 1, Vol. IV at pp. 280-282).

under 402, not under 404 subsection (2). It explains the position
of the decedent, the witness, the Defendant; it explains and shows
their conduct of the Defendant and the witness just subsequent to
the shooting; it is inseparable from the events that occurred and is
relevant under 402.

I will grant it to the extent that there should be no testimony
of there being any intentional shooting. It is not admissible as
evidence of other crimes or other acts under 404.2.

(T.T. 145) Consequently, testimony regarding Mays being shot was admissible, but
no testimony was to be admitted that the Defendant intentionally shot Mays.

During closing, the prosecutor noted that after shooting Dixon, the Defendant
drove Mays to his sister's house and asked her to get him help. The prosecutor asked
why the Defendant did not take Mays to the hospital himself and then stated, "Why
not? Because he shot him. And there would be all kinds of uncomfortable questions."
(T.T. 538) This testimony was not objectionable. The prosecutor did not argue the
Defendant intentionally shot Mays, just stated the fact that "he shot him."
Consequently, the Defendant has failed [sic] establish any prejudice because he fails
to present any legally sufficient basis upon which counsel could have objected to this
portion of the prosecutor's argument.

(Resp., Ex. 10 at pp. 17-18).

Because the trial court denied Petitioner's motion in limine to preclude any testimony or

evidence indicating that he shot Mays, and found that the fact Mays was shot was admissible,

counsel did not have any grounds to object to either Mays's testimony that he was shot, or the

prosecutor's statement that Petitioner shot Mays.

In conclusion, the state court applied the correct principles under *Strickland* in assessing

counsel's performance. Petitioner has not shown that the state court's adjudication of his ineffective

assistance of counsel claims involved an "unreasonable application" of *Strickland*. *See Bell v. Cone*,

535 U.S. 685, 698 (2002)(citing *Williams v. Taylor,* 529 U.S. 362, 411 (2000)). Petitioner is

required to establish that the state courts applied *Strickland* to the facts in an "objectively

32

unreasonable manner." *Bell*, 535 U.S. at 699.

Counsel's conduct is entitled to a "strong presumption" that it fell with a "wide range of reasonable professional assistance." *Bell*, 535 U.S. at 702(citing *Strickland*, 466 U.S. at 689). Considering counsel's arguments, objections and cross examination of the various prosecution witnesses, and his presentation of an alibi witness, it cannot be said that Petitioner has overcome the "strong presumption" that counsel's conduct was reasonable. Accordingly, petitioner has not shown that the state court's application of *Strickland* was "objectively unreasonable."

**Ground Fifteen**

Griner argues that his sentence violates due process and his right to a jury trial. He contends that during sentencing, the judge found Griner was a great risk to others because he had shot the victim and Mays. He asserts this was error because at trial there was no evidence that he owned or possessed a gun, and no evidence that he shot the victim or Mays. Essentially, Griner asserts that the trial judge relied on evidence that was not presented to the jury to enhance his sentence. Griner is not entitled to relief because the claim is without merit for the reasons stated in the order denying his Rule 3.850 motion:

### Sentence Claim

On the last two pages (33-34) of his Motion, Defendant claims that his sentence of life imprisonment under the 10-20-life law is in violation of his right to be tried by a jury where no evidence was presented to the jury that the Defendant possessed a firearm, and no witness testified that they saw the Defendant with a firearm or saw him shoot the victim. Defendant points to the Court's statements during sentencing and argues that the Court relied on "evidence not before the jury" to enhance his sentence.

This claim has entirely no merit. The jury verdict form in this case clearly denotes a finding by the jury that during the commission of the offense, the Defendant (a) actually possessed a firearm; (b) discharged the firearm; and (c) in

33

discharging the firearm, the Defendant inflicted death or great bodily harm upon Vernon Dixon. The Court noted these findings and other facts brought out at trial at the sentencing hearing on December 23, 2002. The Court subsequently entered Orders correcting and clarifying the Defendant's sentence. In no way, however, did the Court consider facts that were not presented to the jury in imposing sentence on the Defendant.

(Resp., Ex. 10 at pp. 18-19).

In *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the Supreme Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490. As the state court found, the record establishes that the jury specifically found that Griner possessed and discharged a firearm, and in so doing inflicted death or great bodily harm on the victim (Resp., Ex. 1, Vol. VI at p. 595). Petitioner was convicted of second degree murder, and sentenced pursuant to Section 775.087(2), Florida Statutes (Resp., Ex. 1, Vol. VIII at pp. 285-92). Griner's life sentence is not beyond the prescribed statutory maximum. *See,* Section 775.087(2)(a)3., Florida Statutes ("Any person who is convicted of a felony...and during the course of the commission of the felony such person discharged a 'firearm'...and, as the result of the discharge, death...was inflicted upon any person, the convicted person shall be sentenced to a minimum term of imprisonment of not less than 25 years and not more than a term of imprisonment of life in prison."). Moreover, no facts were found which were not already found in the jury verdict for this offense. Accordingly, the state court's denial of relief on Petitioner's *Apprendi* claim was neither contrary to, nor involved an unreasonable application of, clearly established Federal law.

## Conclusion

For reasons set forth *supra*, the Court finds that Petitioner has not demonstrated that he is

34

entitled to federal habeas relief.

ACCORDINGLY, the Court **ORDERS** that:

1. The Petition for Writ of Habeas Corpus is **DENIED** (Dkt. 1).

2. The **Clerk** shall enter judgment against Petitioner, terminate all pending motions, and

close this case.

**DONE and ORDERED** in Tampa, Florida, on _September 8th_, 2008.

JAMES D. WHITTEMORE
United States District Judge

SA:sfc
Copy to: Petitioner
          Counsel of Record